```
            IN THE UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF TENNESSEE


TIMOTHY BROWN,                  )
Individually and as next        )
friend of MELODY BROWN,         )
his minor daughter,             )
                                )
              Plaintiffs,       )
                                )
vs.                             )
                                )   CASE NO.
UNITED STATES,                  )   03-2282ML/A
                                )
              Defendant.        )
```

COPY

VIDEOTAPED DEPOSITION OF:

NOEL TULIPAN, M.D.

Taken on behalf of the Defendant

August 7, 2007

VOWELL & JENNINGS, INC.
Court Reporting Services
214 Washington Square Building
207 Second Avenue North
Nashville, Tennessee 37201
(615) 256-1935

```
 1   APPEARANCES:
 2
     For the Plaintiffs:
 3
       JAMAL K. ALSAFFAR
 4     Archuleta, Alsaffar & Higginbotham
       1100 Lakeway Drive
 5     Suite 101
       Austin, Texas 78734
 6     Telephone: 512.266.4646
       E-mail: jalsaffar@govtclaim.com
 7
     For the Defendant:
 8
       ~~WILLIAM W. SILER~~
 9     United State Attorneys Office
       Western District of Tennessee
10     167 North Main Street
       Suite 800
11     Memphis, Tennessee 38103
       Telephone: 901.544.4231
12     E-mail: bill.siler@usdoj.gov

13   Also Present:

14     Carissa L. Boone
       Vowell & Jennings
15     214 Second Avenue North
       Suite 207
16     Nashville, Tennessee 37219
       Direct Dial: 256.531.3698
17     E-mail: Carissaboone@comcast.net

18     Jason Powers
       Vowell & Jennings
19     214 Second Avenue North
       Suite 207
20     Nashville, Tennessee 37219
       Telephone: 615.256.1935
21     E-mail: Video@vowelljennings.com

22

23

24

25
```

```
 1              THE VIDEOGRAPHER:  Here begins
 2    Volume 1, Videotape No. 1 in the deposition
 3    of Dr. Noel Tulipan in the matter of Timothy
 4    Brown versus United States in the U.S.
 5    District Court, Western District of
 6    Tennessee.  The Case No. is 03-2282ML/A.
 7    Today's date is August 7th, 2007.  Time on
 8    the video monitor is 1:20.  The video
 9    operator today is Jason Powers of Vowell &
10    Jennings.
11              Counsel, please identify
12    yourselves and state whom you represent.
13              MR. SILER:  I'm William W. Siler,
14    United States Attorney's Office, Memphis, for
15    the Defendant.
16              MR. ALSAFFAR:  Jamal Alsaffar
17    representing the Plaintiffs, the Brown
18    family.
19              THE VIDEOGRAPHER:  Thank you.
20              The court reporter today is
21    Carissa Boone of Vowell & Jennings.
22              Would the reporter please swear in
23    the witness?
24              NOEL TULIPAN, M.D.,
25    having been first duly sworn, was examined,
```

```
 1  and testified as follows:
 2             E X A M I N A T I O N
 3  QUESTIONS BY MR. SILER:
 4  Q.     Dr. Tulipan, would you state your full
 5  name for us, please.
 6  A.     I'm Dr. Noel Tulipan.
 7  Q.     Where is your office address?
 8  A.     I'm based at the Doctors' Office Tower
 9  of Vanderbilt Children's Hospital in
10  Nashville, Tennessee.
11  Q.     And you are a medical doctor there; is
12  that correct?
13  A.     Yes, sir, I am.
14  Q.     I want to go over your credentials a
15  little bit.  First, let me ask you to
16  identify your CV (tendering).
17  A.     Yes, this is it.
18             MR. SILER:  I'll ask that this be
19  marked as Exhibit 1.
20             (Exhibit No. 1 was marked.)
21  BY MR. SILER:
22  Q.     Where are you licensed to practice
23  medicine, Dr. Tulipan?
24  A.     I'm licensed in the state of Tennessee
25  only.
```

```
 1  at trial, and is it your --
 2  A.      Yes.
 3  Q.      Let me just get the question on the
 4  record.
 5  A.      Okay.
 6  Q.      Are you telling the Court that "I'm
 7  just not available on the week of October
 8  15th"?
 9  A.      Right, I won't be there.
10  Q.      Okay.  Now, let's go back to -- to
11  what you reviewed.  Did you review the
12  physical therapy notes, occupational,
13  physical therapy notes for --
14  A.      I glanced over them but I certainly
15  have not memorized them and didn't pay that
16  much attention to them.
17  Q.      Okay.  Did you review any of her
18  current treating physician's notes or medical
19  records?
20  A.      Yes.  I looked at the neurosurgical
21  records from Dr. Ianhouse (phonetic).
22  Q.      Okay.  Other than Dr. Ianhouse, did
23  you look at any other specific treating
24  physician?
25  A.      Not that I can recall.
```

```
 1  Q.     Okay.  Pediatricians, you didn't
 2  review that you can recall?
 3  A.     Not that I can recall.
 4  Q.     Okay.  I believe you'd said that a
 5  summary was provided to you by the attorney
 6  for the -- for the Government, Mr. Siler?
 7  A.     That's correct.
 8  Q.     Okay.  Do you mind if I take a look at
 9  that?
10  A.     Sure.
11  Q.     That almost got me.
12  A.     Yeah.
13  Q.     Okay.  Doctor, you've shown me a
14  letter dated June 8th, 2007, two-page letter;
15  is that correct, from Mr. Siler?
16  A.     Yes, correct.
17  Q.     Okay.  And is this the medical summary
18  Mr. Siler created for you that you relied on
19  in coming to your opinions in this case?
20  A.     Yes, sir.
21  Q.     All right.  And I believe you said
22  that you relied primarily on this letter from
23  Mr. Siler as well as the reports from the
24  Plaintiffs' experts; is that fair to say?
25  A.     That's correct.
```

```
 1  A.      Yes.  I think it's not more than a
 2  couple hours.
 3  Q.      Okay.  So not including the deposition
 4  time, because now you're just telling us what
 5  your opinion is rather than review for it.
 6  Is it -- so up -- up to today in forming your
 7  opinion on Melody Brown's life expectancy,
 8  you've spent a couple of hours in preparation
 9  for your opinions; is that fair to say?
10  A.      That's correct.  Once again, not
11  withstanding 20-plus years of experience.
12  Q.      Sure.  And let's just assume that
13  every time you give a medical opinion, you're
14  basing it on your experience.
15  A.      Right.
16  Q.      Yeah.  Let's assume that for the rest
17  of the deposition.
18          All right.  So in preparation for your
19  specific opinions in this case, you've spent
20  a total of a couple of hours over --
21  A.      That's correct.
22  Q.      Okay.  And you're going to bill the
23  Government for that, right?
24  A.      Yes, sir.
25  Q.      Okay.  Is your hourly rate for review
```

```
 1  normal life expectancy, and that it's
 2  significantly reduced when compared to a
 3  patient without the problems of -- that are
 4  entailed by spina bifida.
 5  Q.     So you believe her life expectancy
 6  will be reduced from the normal life
 7  expectancy of -- of a female?
 8  A.     Yes.
 9  Q.     And what is the normal life expectancy
10  of a female, your understanding?
11  A.     To the best of my knowledge, it's in
12  the mid-80s for somebody who doesn't have
13  some other predisposing problem.
14  Q.     All right.  So I'm going to break it
15  down a little bit.  So you believe that --
16  that she -- that Melody Brown will not have a
17  life expectancy in the mid-80s.  It'll be
18  somewhere below that?
19  A.     Yes, sir.
20  Q.     Okay.  But you can't tell the Court
21  specifically what number her life expectancy
22  is going to be, other than it's not going to
23  be a normal one?
24  A.     Correct.
25  Q.     And I believe you said one of the
```

```
 1  reasons for that is that we just don't have
 2  the long-term data, medically speaking, in
 3  order to determine a specific life expectancy
 4  for somebody with spina bifida?
 5  A.     I'd say that's correct.
 6  Q.     And Doctor, in forming your -- your
 7  opinion that -- that she doesn't have a
 8  normal life expectancy, did you compare
 9  Melody Brown of any specific patient
10  population in order to form that opinion?
11  A.     No, sir.
12  Q.     And I don't -- do you keep a database
13  of your patients regarding their specific
14  type and degree of spina bifida and how long
15  they're living or how long they've lived?
16  A.     No, sir.
17  Q.     Okay.  So you didn't refer to any kind
18  of database based on your personal patient
19  population?
20  A.     That's correct.
21  Q.     You've never seen Melody Brown?
22  You've never met her; is that right?
23  A.     Absolutely not.
24  Q.     All right.  You've never physically
25  examined Melody Brown?
```

```
 1   A.      No, sir.
 2   Q.      Have you ever -- have you asked at any
 3   time Mr. Siler or anybody from the U.S.
 4   Attorney's Office to physically examine
 5   Melody before providing your life expectancy
 6   opinion?
 7   A.      No, sir.
 8   Q.      How would you -- how would you -- I
 9   don't think I asked you this:  How would you
10   classify Melody Brown's spina bifida injury,
11   if you can, based on your review of this
12   case?
13   A.      I don't know off the top of my head.
14   I've -- as I understand it, she had a
15   relatively low-level lumbar lesion, but I
16   don't remember the specific number.
17   Q.      Okay.  So you don't really know what
18   degree or how severe her spina bifida injury
19   is to actually give a qualification of it?
20   A.      No.
21   Q.      Based on your experience with these
22   patients, do you believe Melody Brown will
23   require life-long medical care and follow-up?
24   A.      Yes, sir.
25   Q.      And she's got a permanent life-long
```